## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

United States of America,                                    Crim. No. 15-78 (SRN/BRT)

                  Plaintiff,

v.

Taleb Jamal Awad (2),                                        **REPORT AND**
Vladimir Vladimirovic Brik (3),                              **RECOMMENDATION**
Steven Jay Lyke (4), and
Daniel Lee Lyke (5),

                  Defendants.

---

Surya Saxena, Esq., United States Attorney's Office, counsel for Plaintiff.

Carol Grant, Esq., and Marc G. Kurzman, Esq., Kurzman Grant Law Office, Chtd., counsel for Defendant Awad.

Milana P. Tolins, Esq., Milana P. Tolins, LLC, counsel for Defendant Brik.

Glenn P. Bruder, Esq., Mitchell Bruder & Johnson, counsel for Defendant Steven Lyke.

Gary R. Wolf, Esq., Wolf Law Office, counsel for Defendant Daniel Lyke.

---

BECKY R. THORSON, United States Magistrate Judge.

       Defendants Taleb Awad, Vladimir Brik, and Steven and Daniel Lyke have been indicted on several conspiracy counts, including conspiring to distribute smokable synthetic cannabinoids containing AM-2201, UR-144, and XLR-11 from March 1, 2011, through December 2013, while each of those chemical compounds was a controlled substance analogue. (Doc. No. 154, Superseding Indictment.) In separate though largely identical motions, Brik and the Lykes seek pretrial dismissal of that specific charge, set

forth in Count 1 of the superseding indictment, arguing that the Controlled Substance Analogue Enforcement Act, 21 U.S.C. § 813, is unconstitutionally vague as applied to their alleged participation in the conspiracy to distribute AM-2201, UR-144, and XLR-11. (*See* Doc. No. 130 (hereinafter "Steven Lyke's Mot. to Dismiss"); Doc. No 148 (hereinafter "Brik's Mot. to Dismiss"); Doc. No. 150 (hereinafter "Daniel Lyke's Mot. to Dismiss").[1]) Awad moves to suppress the suspected synthetic cannabinoids and other evidence seized by the police during searches of a warehouse based on the Fourth Amendment and, in particular, the holding of *Franks v. Delaware*, 438 U.S. 154 (1978). (Doc. No. 151, Def. Awad's Motion for a *Franks* Hr'g and Suppression of Evid.)

This Court held a consolidated motions and *Franks* hearing on November 12, 2015, during which the parties addressed the pending pretrial motions and presented evidence concerning the challenged searches of Awad's leased warehouse space. (*See generally* Doc. No. 242, 11/12/15 Hr'g Tr. (hereinafter "Tr.").) For the reasons discussed below, this Court recommends that the defendants' pretrial motions for dismissal of Count 1 of the superseding indictment and suppression of evidence be denied.

## I. Defendants' Vagueness Challenge to Count 1

Brik and the Lykes move for dismissal of Count 1 of the superseding indictment on vagueness grounds. (*See* Doc. Nos. 130, 148, 150.) Count 1 alleges that Brik and the Lykes, along with codefendants Omar Wazwaz and Taleb Awad, violated the Controlled

---

[1]    Although Daniel Lyke's motion is entitled a "Motion . . . to Suppress Statements, Admissions and Answers," it actually seeks dismissal of Count 1 of the superseding indictment on vagueness grounds. (*See* Doc. No. 150).

Substance Analogue Enforcement Act ("Analogue Act") by conspiring from March 1, 2011, through December 2013 to knowingly distribute smokable synthetic cannabinoids containing AM-2201, UR-144, and XLR-11, while each was a controlled substance analogue within the meaning of 21 U.S.C. § 802(32)(A). (*See* Superseding Indictment ¶¶ 2–9.)

Under the Fifth Amendment's guarantee of due process, "vague statutes are void." *United States v. Washam*, 312 F.3d 926, 929 (8th Cir. 2002). A criminal statute violates due process if it is so vague that it fails to give a person of ordinary intelligence fair notice of what conduct it prohibits, or is so standardless that it invites arbitrary enforcement. *See Johnson v. United States*, — U.S. —, 135 S. Ct. 2251, 2256 (2015); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972). The former inquiry "looks at what a person of common intelligence would reasonably understand the statute to proscribe, not what the particular defendant understood the statute to mean," while the latter looks to whether the statute provides "minimal requirements to guide law enforcement in order to prevent police officers, prosecutors, and juries from pursuing their personal predilections." *Washam*, 312 F.3d at 929, 931 (quotations omitted). "What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is." *United States v. Williams*, 553 U.S. 285, 306 (2008). It is, in other words, the "absence of any ascertainable standard" governing conduct that "offends the Due Process Clause," not the fact that a penal statute "requires a person to conform his conduct to an imprecise but comprehensible normative standard."

*Smith v. Goguen*, 415 U.S. 566, 577 (1974). Where, as here, the challenged statute does not implicate First Amendment freedoms, a vagueness argument "must be examined in the light of the facts of the case at hand." *Washam*, 312 F.3d at 929. Thus, if a defendant actually knew that his conduct was illegal, "he cannot claim that the statute is void for vagueness as applied to him." *Id.* at 930.

The Analogue Act extends the prohibitions of the Controlled Substances Act, which criminalizes the knowing manufacture or distribution of a scheduled controlled substance, to "a controlled substance analogue . . . intended for human consumption." 21 U.S.C. § 813; *see also* 21 U.S.C. § 841(a)(1). A "controlled substance analogue" is statutorily defined as any substance whose chemical structure is "substantially similar" to that of a scheduled controlled substance and which either has, or is represented or intended to have, a "substantially similar" effect on a user's central nervous system. 21 U.S.C. § 802(32)(A); *see also United States v. McKinney*, 79 F.3d 105, 107–08 (8th Cir. 1996), *vacated on other grounds*, 520 U.S. 1226 (1997). Because the purpose of the Analogue Act is to prohibit innovative drugs that are not yet scheduled as controlled substances, but which have similar structures and effects, substances satisfying the definition of a controlled substance analogue are unlawful even though they have not been formally classified as such by the federal government. *See United States v. Sullivan*, 714 F.3d 1104, 1007 (8th Cir. 2013) ("The [Analogue Act] does not . . . require the DEA to classify a substance as a controlled substance analogue before the substance falls under its purview."); *McKinney*, 79 F.3d at 107 ("[T]he analogue statute is aimed at prohibiting innovative drugs before they are specifically listed in the schedules as controlled

4

substances."); *United States v. Fischer*, 289 F.3d 1329, 1336 n.11 (11th Cir. 2002)

(explaining that because "all substances that meet the definition of a controlled substance

analogue are illegal," no list of controlled substance analogues is necessary and, thus, the

"[f]ailure to specifically identify a substance as a controlled substance analogue is of no

consequence").

Even if a substance qualifies as a controlled substance analogue, a defendant

cannot be convicted under the Analogue Act unless he knew that he was dealing with an

analogue—*i.e.*, he knew that the substance was treated as an analogue (even if he did not

know its particular identity) or that its physical properties were substantially similar to a

scheduled controlled substance (even if he did not know its legal status as an analogue).

*McFadden v. United States*, — U.S. —, 135 S. Ct. 2298, 2305–06 (2015). This

knowledge requirement can be proven with direct or circumstantial evidence, including a

defendant's concealment of his activities, evasive behavior with respect to law

enforcement, or knowledge that a particular substance produces a "high" similar to that of

a controlled substance. *Id.* at 2304 n.1.

In moving to dismiss the Analogue Act charge on vagueness grounds, Brik and the

Lykes contend that the indictment's failure to specify the precise timeframe that they

each participated in the alleged conspiracy "creates the risk that [they] will be prosecuted

for activities relating to AM-2201, UR-144 and XLR-11 occurring before July 2012

and/or April 2013 which are the earliest date(s) any defendant might reasonably believe

the government considered AM-2201, UR-144 and XLR011 to be controlled substance

analogues as defined in 21 U.S.C. § 802(32)(A)." (Steven Lyke's Mot. to Dismiss 1–2;

Brik's Mot. to Dismiss 1–2; Daniel Lyke's Mot. to Dismiss 1.) That argument pivots on two underlying propositions. First, that AM-2201 was not scheduled as a controlled substance until July 9, 2012, and that the Drug Enforcement Agency ("DEA") did not explicitly link UR-144 and XLR-11 to AM-2201 until April 2013. (Steven Lyke's Mot. to Dismiss 2; Brik's Mot. to Dismiss 2; Daniel Lyke's Mot. to Dismiss 1.) Second, that the discovery so far disclosed by the government suggests that Brik and the Lykes' individual "participation in the conspiracy ended prior to July 2012." (Steven Lyke's Mot. to Dismiss 3; Brik's Mot. to Dismiss 3; Daniel Lyke's Mot. to Dismiss 2.) The defendants assert that, absent information in the indictment concerning the exact dates that they each entered and exited the charged conspiracy, they risk conviction for acts that were not unlawful and, thus, Count 1 "creates the danger that [the Analogue Act] is vague, as applied to any defendant, whose participation the alleged conspiracy ended prior to July 2012." (Steven Lyke's Mot. to Dismiss 3; Brik's Mot. to Dismiss 3; Daniel Lyke's Mot. to Dismiss 2.)

In his post-hearing memorandum, Steven Lyke focuses less on the indictment's lack of temporal specificity with regard to each defendant, and more on the assertion that he ceased any involvement with the charged conspiracy before July 2012. (Doc. No. 248, Def. Steven Lyke's Mem. of Law in Supp. of Vagueness Challenge.) He maintains that he, Brik, and Daniel Lyke "lacked requisite notice that any of the substances listed in the Indictment were controlled substances or controlled substance analogues prior to either July 2012 when AM-2201 was, for the first time, listed as a controlled substance by Congress, or April 2013 when the DEA first linked UR-144 and XLR-11 to AM-2201."

(*Id.* at 1–2.) In essence, he claims that the defendants did not have fair notice that these substances were illegal until the government expressly classified them as controlled substances or controlled substance analogues. (*Id.* at 4–5.) He further argues that the Analogue Act invites arbitrary enforcement because, "[a]s applied to AM-2201 prior to July 2012, and UR-144 and XLR-11 prior to April 2013, the 'substantially similar' provision neither establishes an ascertainable standard of guilt . . . nor provides minimal standards to guide law enforcement officers." (*Id.* at 7.)

This Court finds that the defendants' motions to dismiss Count 1 of the superseding indictment should be denied for two independent reasons. First, the defendants' as-applied vagueness challenge is premature because it hinges on a number of factual disputes to be resolved at trial, including whether their participation in the charged conspiracy ended before July 2012 (as they claim); whether AM-2201, UR-144, and XLR-11 were substantially similar to a listed controlled substance at the relevant times; and, if so, whether they knew those chemicals were controlled substance analogues. *See United States v. Turcotte*, 405 F.3d 515, 526 (7th Cir. 2005) ("A substance's legal status as a controlled substance analogue is not a fact that a defendant can know conclusively *ex ante*; it is a fact that the jury must find at trial . . . ."). A pretrial motion to dismiss an indictment is not a proper vehicle for resolving factual disputes based on "predictions as to what the trial evidence will be," as the "government is entitled to marshal and present its evidence at trial." *United States v. Ferro*, 252 F.3d 964, 968 (8th Cir. 2001); *see also United States v. Louper-Morris*, No. 08-063, 2009 WL 5030771,

at *7 (D. Minn. Dec. 17, 2009) ("At this stage of the case, defendants' attempt to challenge the Indictment based on disputed facts is inappropriate.").

In this regard, the government notes that it is far from a foregone conclusion that the defendants' involvement in the alleged conspiracy ended before July 2012, and that it intends to prove at trial that the chemical substances in question became controlled substance analogues on March 1, 2011, when JWH-018 was scheduled as a controlled substance. (Doc. No. 219, Gov't's Omnibus Resp. to Defs.' Pretrial Mots. 6, 8.) It also indicates that its trial evidence will show that the defendants had actual notice prior to July 2012 that they were dealing with controlled substance analogues, which would effectively preempt any as-applied vagueness challenge to the Analogue Act. (Doc. No. 253, Gov't's Suppl. Mem. in Opp'n to Mot. to Dismiss 6–8); *see Washam*, 312 F.3d at 930 (explaining that a defendant who has actual notice that his conduct is illegal "cannot claim that the statute is void for vagueness as applied to him"). Indeed, the defendants effectively concede that their vagueness challenge should await the development of a full factual record at trial.[2] (*See* Doc. No. 219 at 14; Doc. No. 253 at 11; Tr. at 38–39.)

Second, putting aside the procedural posture of this case, the defendants' vagueness challenge is foreclosed by the combined weight of the Supreme Court's decision in *McFadden v. United States* and the Eighth Circuit's recent application of

---

[2]     At the motions hearing, the defendants conceded that their vagueness challenge "should be left open to completely develop the record at trial" because, at this stage of the proceedings, "there is not sufficient information" for the Court to "determine as a matter of law" whether AM-2201, UR-144, and XLR-11 are substantially similar to a controlled substance and "that everybody would have known that." (Tr. at 38–39.)

*McFadden* in *United States v. Carlson*, No. 14-2986 (8th Cir. Jan. 14, 2016). In

*McFadden*, the Supreme Court held that the Analogue Act is not unconstitutionally vague

because the statute's scienter requirement "alleviates vagueness concerns" by

"narrow[ing] the scope of its prohibition" and "limit[ing] prosecutorial discretion." 135

S. Ct. at 2307 (quotation and brackets omitted). Indeed, the Act's knowledge requirement

largely fulfills the notice demanded by due process, ensuring that only those who

knowingly deal in controlled substance analogues are subject to conviction and, thus,

mitigating the vagueness doctrine's concern with unfairly ensnaring the innocent. *See*

*Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982)

("[A] scienter requirement may mitigate a law's vagueness, especially with respect to the

adequacy of notice to the complainant that his conduct is proscribed."); *Grayned v. City*

*of Rockford*, 408 U.S. 104, 108 (1972) (explaining that vague laws are particularly

problematic because they "may trap the innocent by not providing fair warning"); *United*

*States v. Carlson*, No. 12-305, 2013 WL 5125434, at *25 (D. Minn. Sept. 12, 2013)

(explaining that the due process notice requirement has "[e]ssentially . . . been

incorporated" into the knowledge element that the government must prove at trial). And

in *Carlson*, the Eighth Circuit applied *McFadden* in rejecting a vagueness challenge

brought by defendants who were charged with conspiring to distribute the very chemicals

at issue here—AM-2201, UR-144, and XLR-11—from August 2011 through September

2012, roughly the same timeframe involved in this case. *Carlson*, No. 14-2986, slip op. at

3–6.

9

With respect to the defendants' vagueness challenge to the Analogue Act, *Carlson* is materially indistinguishable from the circumstances of this case and undermines the contention that the Analogue Act is unconstitutionally vague as applied to AM-2201 prior to July 2012, and UR-144 and XLR-11 prior to April 2013. In fact, though framed as a vagueness challenge, the defendants' arguments in support of dismissing Count 1 of the superseding indictment really go to questions of guilt — most notably, whether they knew that they were dealing with controlled substance analogues when they were dealing with them. That, however, is not a question that can or should be resolved at this early stage of the proceedings, before the government has had an opportunity to present its evidence at trial. *See Carlson*, 2013 WL 5125434, at *28 (explaining that a defendant's argument that he lacked "actual subjective notice that the alleged substances are controlled substance analogues" was a "direct challenge to the sufficiency of the evidence that the Government will have to marshal and show at trial" and, thus, should be raised "after the Government has been provided an opportunity to present its evidence"). For these reasons, this Court recommends that the defendants' pretrial motions to dismiss Count 1 of the superseding indictment be denied.

## II. Awad's Motion to Suppress Evidence

Defendant Awad moves to suppress evidence and statements taken by the police on April 1, 2013, following two searches of a commercial warehouse space that he leased in Oak Lawn, Illinois. (Doc. No. 151, Def. Awad's Mot. for a *Franks* Hr'g & Suppression of Evid.) The first search was conducted without a warrant and uncovered two small packages of suspected synthetic cannabinoids. The second was executed

pursuant to a search warrant, which was issued based on a sworn affidavit stating that Awad had consented to the earlier search and admitted that the suspected packages of synthetic cannabinoids were illegal. Awad challenges both searches under the Fourth Amendment and, in particular, the holding of *Franks v. Delaware*, arguing that the affidavit in support of the search warrant falsely claimed that he consented to the initial search of the warehouse and essentially confessed to possessing synthetic cannabinoids. (Doc. No. 152, Def. Awad's Mem. in Supp. of Mot. for a *Franks* H'rg and Suppression of Evidence ("Awad's Mem.") 4–7.)

Awad supported his motion with an affidavit from Munir Alshujaeih, who stated that he "heard all of the conversations between [Awad] and the two officers who first arrived at [the warehouse]" and that Awad neither consented to a search of the warehouse nor admitted that the packages contained contraband. (Doc. No. 144, Aff. of Munir Alshujaeih.) Based on Alshujaeih's affidavit, this Court granted Awad's request for a *Franks* hearing, finding that he had made a substantial preliminary showing that the warrant affidavit contained deliberate or recklessly made falsehoods and that those alleged falsehoods were necessary to a finding of probable cause.[3] (Doc. No. 216, 10/28/15 Order.) Having now heard the testimony of Oak Lawn Police Detective Michael McNeela and Alshujaeih, this Court finds that Awad consented to the initial search of the warehouse and that the subsequent search warrant was not based on false statements.

---

[3]     The government did not oppose Awad's request for a *Franks* hearing and, indeed, conceded that he had "met his preliminary burden by submitting an affidavit, which if true, would suggest a possible *Franks* violation." (Doc. No. 215 at 1.)

## A. Factual Background

The evidence presented at the *Franks* hearing, including the testimony of Detective McNeela and Alshujaeih, revealed the following facts, most of which are undisputed. While on routine patrol during the afternoon of April 1, 2013, Detective McNeela and his partner, Detective Heilig, noticed several men unloading food items from a semi-trailer into a particular warehouse in Oak Lawn, Illinois. (Tr. at 56, 109–10; *see also* Doc. No. 230, 11/12/15 H'rg, Gov't Ex. 1.) The detectives found this activity "odd" because the warehouse space had previously been occupied by an auto mechanic and, as far as they knew, was currently vacant. (Tr. at 110–12, 155–56; *see also* Gov't. Ex. 2.) Unbeknownst to the officers, Awad had leased the warehouse and was allowing Alshujaeih, a close friend who operated a local food, chocolate, and nut business, to use the space to unload a large overseas shipment of bulk food items. (Tr. at 55–56, 61–62, 65, 82, 96, 116.) As they watched the warehouse, Detective McNeela and his partner happened to receive a dispatch call concerning a report of suspicious activity at that very location. (Tr. at 109, 112–13; *see also* Def.'s Ex. 1.) Detective McNeela would later learn that the report of suspicious activity came from an Oak Lawn Village Trustee. (Tr. at 112–13.)

After parking their patrol car, Detectives McNeela and Heilig walked up the driveway leading to the open warehouse door, where Awad, Alshujaeih, and at least four other men were unloading the semi-trailer. (*Id.* at 56, 63, 110, 113, 115, 117.) The officers asked Awad and Alshujaeih what they were doing and learned that Awad was letting Alshujaeih unload various food items into his warehouse. (*Id.* at 56, 65, 115–16.)

The detectives were somewhat troubled by that response because the erstwhile mechanics shop, with its dirty, oil-stained floor, did not seem like a suitable place to store food. (*Id.* at 116–18.) The officers would ultimately contact a health inspector to determine whether storing food in the warehouse violated health codes. (*Id.* at 129.) At this juncture, Detective McNeela and Alshujaeih's accounts of the events begin to differ sharply.

### 1. Detective McNeela's Account

Detective McNeela testified that he asked Awad whether the officers could take a look inside the warehouse and that Awad responded with words to the effect of "[y]eah, go ahead." (Tr. at 118, 157, 159.) Based on his training and eight years of law enforcement experience, McNeela knew that, absent exigent circumstances, he could not enter the warehouse without consent or a warrant. (*Id.* at 107, 118.) For that reason, he and his partner were deliberately cordial with Awad and Alshujaeih, "trying to develop a rapport" because they intended to ask permission to search the warehouse. (*Id.* at 118.)

Detective McNeela testified that, after obtaining consent, Awad accompanied him and his partner into the warehouse, politely pointing out and describing various items that were stored inside. (*Id.* at 119–20, 123.) As they walked through the warehouse with Awad, the officers noticed two small plastic containers—one labeled Bullet, the other Wicked—on the cement floor beside some boxes. (*Id.* at 123–27.) Detective McNeela testified that the packages were in plain view; neither he nor his partner had to open or move any boxes to see them. (*Id.* at 124–25.) Both packages indicated that they contained some type of herbal supplement not intended for human consumption, a common feature among synthetic cannabinoids. (*Id.* at 126, 162–63; Gov't Ex. 4.) Suspecting that they

13

might indeed contain synthetic cannabinoids, Detective McNeela asked Awad about the packages. (*Id.* at 127, 160–62.) According to McNeela's testimony, Awad referred to the packages as "spice," "weed," or "fake weed," and said that he knew they were illegal and that he should not have them. (*Id.* at 127, 160.) Detective McNeela was not surprised that Awad would admit to possessing a small amount of contraband when confronted with the packages because, in his experience, people will often admit to such minor offenses in the hope and belief that an honest response will lead the police to give them a "break" by "looking past" those infractions. (*Id.* at 128, 164.)

Soon after, the health inspector arrived and informed Awad and Alshujaeih that the warehouse's condition made it unsuitable for storing food and that the items already inside might need to be destroyed. (*Id.* at 129–30.) Detective McNeela testified that the inspector's comments upset the two men, leading Awad to withdraw his consent by stating that he did not want the authorities "in his building anymore." (*Id.* at 130.) The detectives, believing that there might be more synthetic cannabinoids in the warehouse, told Awad that they would obtain a search warrant, exited the building, and secured the scene so that no one could enter the space before a warrant was issued. (*Id.* at 130–31.) Detective McNeela enlisted a fellow officer who had arrived on the scene, Detective Michael Sikorski, to apply for the warrant and relayed the relevant information to him, including Awad's initial consent to search the warehouse and admission to possessing a small amount of synthetic cannabinoids. (*Id.* at 132–34.) Detective McNeela did so because he wanted to give Detective Sikorski, a relative newcomer to his tactical unit, an

opportunity to gain more experience in drafting search warrant affidavits, presenting them to a state's attorney for approval, and then appearing before a judge. (*Id.* at 132.)

Based on the information relayed by McNeela, Detective Sikorski drafted a complaint for a warrant to search the warehouse for synthetic cannabinoids and items related to their manufacture, distribution, and possession. (Gov't Ex. 1.) Sikorski's affidavit stated that Detectives McNeela and Heilig had been dispatched to the warehouse on a "report of a suspicious semi trailer that was unloading items into the building," noticed "several health code violations" and contacted a health inspector to respond to the scene, and asked Awad if they could look inside the building. (*Id.* at 2–3.) The affidavit indicated that Awad said "sure go ahead" and, after the officers found two packages of suspected synthetic cannabinoids on the ground, he stated "I know its illegal cannabis and I shouldn't have it." (*Id.* at 3.) The affidavit further noted that Awad withdrew his consent to search the warehouse after the health inspector indicated that it "was not permitted to store any food for consumption." (*Id.*) At the evidentiary hearing, Detective McNeela admitted that he did not provide Sikorski with any direct quotes from Awad, that he was unsure why Sikorski placed quotes around the phrases "sure go ahead" and "I know it is illegal cannabis," and that Awad had actually used a slang term for marijuana, such as "spice" or "fake weed," rather than "cannabis." (Tr. at 136–38, 161.) McNeela nevertheless insisted that the quoted statements accurately conveyed the substance of Awad's statements, including his consent to search the warehouse and admission that the two packages found by the police contained illegal synthetic cannabinoids. (*Id.* at 136–39, 160–61.) Detective McNeela believed that Sikorski may have used the more formal

term "cannabis" because officers traditionally "refer to marijuana or weed as [such]" in their official reports. (*Id.* at 138.)

An Illinois judge, relying on Detective Sikorski's affidavit, issued a warrant to search the warehouse for synthetic cannabinoids and related items. (*Id.* at 139–40; Gov't Ex. 1 at 1.) Officers executed the warrant, ultimately uncovering a total of 5268 packages of suspected synthetic cannabinoids, including K2, Spice, and Kush Bomb. (Gov't Ex. 1 at 4.)

### 2. Munir Alshujaeih's Account

Alshujaeih's testimony at the evidentiary hearing contradicted Detective McNeela's account in several respects. Alshujaeih testified that, following a cordial conversation with Detectives McNeela and Heilig, the officers aggressively barged into the warehouse and began rummaging through boxes, all without asking for permission and obtaining consent. (Tr. at 56–58, 64–65, 73.) Alshujaeih, who was standing beside Awad and approximately seven to eight feet away from the officers, testified that the detectives found the two containers of suspected synthetic cannabinoids after they had been digging in and around boxes. (*Id.* at 57–59.) Alshujaeih did not know whether the containers were found inside a box or on the floor, nor could he precisely recall where in the warehouse they were located. (*Id.* at 58, 70, 73.) Alshujaeih further testified that Awad, when asked about the packages, responded that he had never seen them before and did not know what they were or where they came from. (*Id.* at 59, 96.) Alshujaeih conceded on cross-examination that neither he nor Awad told the officers that they did not have permission to search the warehouse. He also admitted that he never lodged a

complaint with the Oak Lawn Police Department concerning the officers' actions. (*Id.* at 74–75.) When asked why, Alshujaeih testified that the Oak Lawn Police Department was "not a very nice Police Department" and was "racist." (*Id.*) He expressed those views despite indicating that he had never had any serious interactions with the police and without providing a concrete explanation for his beliefs. (*Id.* at 60, 74.)

## B. Analysis

Awad's challenge to the April 1, 2013 searches of the warehouse rests on three basic Fourth Amendment principles. First, absent consent or some other well-established exception to the Fourth Amendment's warrant requirement, a warrantless search is unconstitutional.[4] *See United States v. Farnell*, 701 F.3d 256, 261–62 (8th Cir. 2012). Second, a warrant obtained after an unconstitutional search is invalid "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry" or if the information gleaned during that entry was the basis for the issuing judge's probable-cause determination. *United States v. Swope*, 542 F.3d 609, 613–14 (8th Cir. 2009). Third, a search warrant is likewise invalid under *Franks v. Delaware* if "(1) a law enforcement officer knowingly and intentionally, or with reckless disregard for the truth, included a false statement in the warrant affidavit, and (2) without the false statement, the affidavit would not have established probable cause." *United States v. Neal*, 528 F.3d 1069, 1072 (8th Cir. 2008). Where, as here, a warrant affidavit is based on information

---

[4]    Although consent must be voluntary to sustain a warrantless search, Awad does not argue that any consent given was made under duress; instead, his argument is that there was no consent at all. (*See* Doc. No. 249, Def. Awad's Suppl. Mem. 2.) Accordingly, there is no need to assess the voluntariness of any consent given.

that the affiant received from other officers, the question under the first prong of *Franks* is whether the affidavit contained a false statement and, if so, whether any of the officers involved "acted intentionally, deliberately, or with reckless disregard for the truth when they caused the false statement to be included in the affidavit." *Id.* at 1072–73. Negligent or inadvertent mistakes are not enough. *Id.* at 1072.

Drawing on these legal principles and the hearing testimony of Alshujaeih, Awad contends that the initial warrantless search of the warehouse was improper because he never consented to the search, and that the subsequent search warrant is invalid because there would not have been probable cause to support its issuance absent the false statements that he consented to the initial entry and admitted that the two packages found by the police contained illegal contraband. (Awad's Mem. 6–7.) As Awad recognizes, the merits on his Fourth Amendment challenge primarily hinge on whether he consented to the initial warrantless search of the warehouse, which, in turn, rests on the relative credibility of Alshujaeih and Detective McNeela's testimony at the evidentiary hearing. (*See* Doc. No. 249, Def. Awad's Suppl. Mem. 1–5.) If, as the warrant affidavit indicated and Detective McNeela testified, Awad consented to the initial search of the warehouse, then that search was permissible under the Fourth Amendment, the subsequent search warrant could rest on the suspected synthetic cannabinoids found during the initial entry, and Detective Sikorski's affidavit in support of that warrant did not fabricate Awad's consent. But if, as Alshujaeih testified, Awad never consented to the initial search and admitted to possessing illegal contraband, then the initial entry was unconstitutional and

the subsequent warrant was tainted by both the information gleaned from that initial entry and falsehoods contained in the warrant affidavit.

In the suppression context, "[t]he assessment of a witness's credibility is the province of the trial court," *United States v. Coney*, 456 F.3d 850, 860 (8th Cir. 2006), as that court is best situated to assess "variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said," *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575 (1985). Based on the content and characteristics of the testimony offered at the evidentiary hearing, including the demeanor, consistency, and level of detail of the witnesses, this Court finds Detective McNeela to be a more credible witness than Alshujaieh and, as such, credits the detective's testimony that Awad both consented to the initial warrantless search of the warehouse and acknowledged that the packages found in plain view contained illegal synthetic cannabinoids. Alshujaeih's recollection and testimony about the underlying events were far less detailed than Detective McNeela; save for the key issues raised in Awad's motion, Alshujaeih struggled to recall specific details about the incident, including the layout of the warehouse and the location of the two packages initially found by the police. (*See* Tr. at 70, 72–73, 95.) Alshujaeih also gave seemingly shifting, evasive, and inconsistent answers to questions about certain aspects of his relationship with defendants Awad and Wazwaz. When asked whether he had ever received any money from Awad or Wazwaz, Alshujaeih initially responded with an unequivocal "[n]o." (*Id.* at 83–85.) Only after he was confronted with a $2,000 check that he had received from Wazwaz's business did Alshujaeih acknowledge that Wazwaz had purchased food items from him and that both

19

Awad and Wazwaz had donated financially to some charitable work that he had done. (*Id.* at 85–87.) Alshujaeih also indicated that he had served as Wazwaz's real estate broker in 2013, for which he received two percent of the $460,000 sale price of Wazwaz's home (*i.e.*, $9,200). (*Id.* at 88–89.) When asked whether Wazwaz had given him power of attorney, along with the ability to sign documents on Wazwaz's behalf, Alshujaeih initially testified that he was "just a broker" and "was never given the ability to sign documents on [Wazwaz's] behalf." (*Id.* at 88, 93, 99.) Again, Alshujaeih offered a different answer when confronted with documentary evidence showing that he had been given power of attorney and could sign for Wazwaz.[5] (*Id.* at 99–100.)

Awad, in his post-hearing memorandum, contends that there is nothing suspicious about Alshujaeih selling $2,000 worth of food items to Wazwaz, receiving charitable donations from Awad, or having power of attorney in connection with a real estate transaction involving Wazwaz. (Awad's Suppl. Mem. 4–5.) This Court agrees that there is nothing inherently suspicious about those activities. That, however, is not the point. The point is that Alshujaeih's shifting responses to questions about his financial connections to Wazwaz and Awad cast doubt on his credibility and motives for testifying,

---

[5]    There was one other notable discrepancy in Alshujaeih's testimony. When questioned about the affidavit that he had filed in support of Awad's suppression motion, which specifically referenced the contents of Detective Sikorski's warrant affidavit, Alshujaeih initially testified that the affidavit was in his own words and that he told Awad's attorney "exactly what he remembered." (Tr. at 78.) Alshujaeih later acknowledged, however, that he never actually looked at Sikorski's warrant affidavit, but was informed of its contents through Awad's attorney, and that his own affidavit was not, strictly speaking, in his own words, but was "modified" by Awad's attorney to make it look legal. (*Id.* at 81–82, 91.)

particularly when combined with his admissions that he wants to "help" his "very good

friend" Awad. (*See* Tr. at 82, 90.)

Awad also insists that Detective McNeela's testimony should not be credited

because (1) it was not corroborated by documentary or other evidence, including a

recording or signed consent form; (2) the detective "had and has a motive to falsify his

testimony" about the consent and confession because, without them, the initial entry into

the warehouse would be unconstitutional and insufficient grounds would exist for issuing

the subsequent search warrant; and (3) it is improbable that, "knowing that there were

illegal drugs on the premises," he would essentially invite the officers to look around and

then confess to a crime. (Awad's Suppl. Mem. 2–3, 5.) This Court is not persuaded by

those arguments, at least not to such a degree as to overlook the flaws in Alshujaeih's

testimony and accept it over the testimony of Detective McNeela.

While McNeela undoubtedly has a possible motive to lie, so does Alshujaeih.

Alshujaeih, by his own admissions, is a "very good friend" of Awad and his family,

having known them "since he was eleven years old" and first arrived in this country, who

not only wants to "help [his] friend," but believes that Oak Lawn police officers are

fundamentally "racist." (*See* Tr. at 74, 82, 90, 98.) Alshujaeih's testimony was also just as

uncorroborated by objective documentary evidence as McNeela's, and the lack of a

signed consent form or other physical recording of consent is of no moment. *See United

States v. Archer*, 840 F.2d 567, 573 (8th Cir. 1998) (noting that verbal consent is

sufficient by itself to authorize a search). Furthermore, there is nothing improbable about

a person consenting to a search and then confessing to a relatively minor offense, hoping

that the appearance of candor and honesty may dissuade the police from investigating further and potentially discovering evidence of a more serious crime. It seems, at least to this Court, more probable that Awad consented to a search of a warehouse and then admitted to possessing two small packages of synthetic cannabinoids than that an experienced officer like Detective McNeela would, as Alshujaeih testified, simply barge into the warehouse without even attempting to obtain permission and then risk his professional career by fabricating evidence and committing perjury. That is especially true given that Detective McNeela, when he first arrived at the warehouse, did not appear to have any basis for suspecting that Awad was involved in anything more than a relatively innocuous health code violation involving the improper storage of food. Indeed, if McNeela had fabricated Awad's consent to search the warehouse, why would he go through the trouble of also fabricating the withdrawal of consent, which necessitated obtaining a search warrant, rather than simply completing a warrantless search of the premises? In sum, this Court finds Detective McNeela to be a more credible witness than Alshujaeih based on their overall demeanor at the hearing, the consistency and detail of their testimony, and the relative plausibility of their respective accounts of the events.

Crediting the testimony of Detective McNeela, this Court finds that the initial warrantless search of the warehouse was permissible based on Awad's consent, and that the subsequent warrant to further search the premises was neither tainted by illegally obtained information nor false statements in Detective Sikorski's affidavit. Moreover, while the warrant affidavit's use of quotations, particularly in the statement "I know its

illegal cannabis and I shouldn't have it," was not strictly accurate, the Court finds that the affidavit accurately conveyed the substance of Awad's consent and admission to possessing contraband. According to Detective McNeela's testimony, Awad used a slang term for cannabis, such as "spice," "weed," or "fake weed," and indicated that he knew it was illegal and that he should not have it. (*See* Tr. at 127, 136–39, 160–61.) The warrant affidavit's suggestion that Awad used the more formal term "cannabis," though imprecise, does not alter or distort the essential meaning of his statement, nor does it reflect a deliberate or reckless misrepresentation of material fact on the part of Detective Sikorski. *See United States v. Anderson*, 243 F.3d 478, 482 (8th Cir. 2001) ("We see nothing in the misquotation itself, which is not in any way egregious, to support an inference of reckless or intentional fabrication."); *United States v. Shields*, 783 F. Supp. 1058 (N.D. Ill. 1991) (finding no *Franks* violation based on a misquotation that did "not distort the apparent meaning of [the defendant's] remark" and, therefore, was so slight a mistake as to be "immaterial"). Accordingly, this Court finds no *Franks* violation.

## RECOMMENDATION

Based on the foregoing, and on all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.     Defendants Steven Lyke, Vladimir Brik, and Daniel Lyke's pretrial motions to dismiss Count 1 of the superseding indictment on vagueness grounds (Doc. Nos. 130, 148, 150) be **DENIED**; and

2.     Defendant Taleb Awad's motion to suppress evidence (Doc. No. 151) be **DENIED**.

Date:  January 19, 2016

_s/ Becky R. Thorson_
BECKY R. THORSON
United States Magistrate Judge

**NOTICE**

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals. Under Local Rule 72.2(b), any party may file and serve specific written objections to this Report and Recommendation by **February 2, 2016**. A party may respond to those objections within **fourteen days** after service thereof. All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.